No. 14-10277

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellee,*

v.

**XIAOYING TANG DOWAI,**
*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE NORTHERN MARIANA ISLANDS
Case 1:13-cr-00014-RVM

# ANSWERING BRIEF OF THE UNITED STATES

ALICIA A.G. LIMTIACO, United States Attorney
Districts of Guam and the Northern Mariana Islands

Ross K. Naughton
Assistant United States Attorney
P.O. Box 500377
Horiguchi Building, Third Floor
Saipan, MP 96950
(670) 236-2980

Attorneys for Plaintiff-Appellee

# TABLE OF CONTENTS

I. JURISDICTION, TIMELINESS & BAIL .......... 1
II. ISSUES .......... 2
III. STATEMENT OF THE CASE .......... 3
A. Introduction .......... 3
B. The Criminal Conduct .......... 4
1. Background .......... 4
2. The meeting .......... 4
3. The marriage .......... 4
4. Married life .......... 5
5. The green card application .......... 5
6. The USCIS interview .......... 8
7. Aftermath .......... 10
C. The Procedural History .......... 11
1. Pre-trial .......... 11
2. Trial .......... 11
3. Post-trial .......... 13
IV. SUMMARY OF THE ARGUMENTS .......... 14
V. ARGUMENTS .......... 16
A. The Evidence Was Sufficient to Sustain Tang's Conviction on Count 2 .......... 16
1. Standard of review .......... 17
2. Applicable Law .......... 17
(i) Test .......... 17
(ii) Substantive law .......... 19
3. Argument .......... 20
B. There Was No Reversible Error in the Jury Instructions .......... 27
1. Standard of Review .......... 29
2. Applicable Law .......... 31
3. Argument .......... 31
(i) There is no "materiality" element in a Section 371 conspiracy to defraud the United States .......... 31
(ii) Tang's proposed "materiality" instruction did not set forth

appropriate principles of the law for the jury to apply to the facts of this case ........ 35

(iii) Even if points (i) and (ii) fail, any instructional error was harmless ........ 40

C. The District Court Correctly Denied Tang's Motion to Dismiss the Indictment, to the Extent Based on the Constitutionality of the Charges ........ 43

1. Standard of Review ........ 44

2. Applicable Law ........ 44

3. Argument ........ 44

(i) The charges are not unconstitutionally vague ........ 44

(ii) The offenses charged were not eliminated by *Windsor* ........ 49

D. The District Court Correctly Denied Tang's Motion to Dismiss the Indictment, to the Extent Based on the Constitutionality of 48 U.S.C. § 1821 ........ 51

1. Standard of Review ........ 53

2. Applicable Law ........ 54

3. Argument ........ 54

(i) Tang fails to explain why the Court was wrong to reject her precise argument previously ........ 54

(ii) Tang fails to explain why Section 1821 could not be deemed a lawful exercise of Congress's power of Section 105 of the Covenant ........ 56

VI. CONCLUSION ........ 60

# TABLE OF AUTHORITIES

Cases

Agyeman v. INS,
296 F.3d 871 (9th Cir. 2002) ........ 51
Bark v. INS,
511 F.2d 1200 (9th Cir. 1975) ........ 45, 49
Chaunt v. United States,
364 U.S. 350 (1960) ........ 36
Coleman v. Johnson,
566 U.S. ___, 132 S. Ct. 2060 (2012) ........ 19
Dennis v. United States,
384 U.S. 855 (1966) ........ 33, 45
Dixon v. United States,
548 U.S. 1 (2006) ........ 34
Gonzales v. Carhart,
550 U.S. 124 (2007) ........ 44
Jackson v. Virginia,
443 U.S. 307 (1979) ........ 17, 18
Koth v. USCIS,
2014 WL 583485 (W.D. Wash. Feb. 14, 2014) ........ 51
Kungys v. United States,
485 U.S. 759 (1988) ........ 27, 35, 36, 41
Lutwak v. United States,
344 U.S. 604 (1953) ........ 45, 49
Maynard v. Cartwright,
486 U.S. 356 (1988) ........ 45
McMillan v. Pennsylvania,
477 U.S. 79 (1986) ........ 34
N.Y. State Club Ass'n, Inc. v. City of New York,
487 U.S. 1, (1988) ........ 54, 60
Neder v. United States,
527 U.S. 1 (1999) ........ 32, 33, 41
Northern Mariana Islands v. United States,
399 F.3d 1057 (9th Cir. 2005) ........ 58
Reno v. Condon,
528 U.S. 141 (2000) ........ 54
San Remo Hotel, LP v. San Francisco City and County,
364 F.3d 1088 (9th Cir. 2004) ........ 50
Shalala v. Ill. Council on Long Term Care, Inc.,
529 U.S. 1 (2000) ........ 50
United States ex rel. Richards v. De Leon Guerrero,
4 F.3d 749 (9th Cir. 1993) ........ 57

United States v. Albino-Loe,
747 F.3d 1206 (9th Cir. 2014) .......... 46

United States v. Alexander,
48 F.3d 1477 (9th Cir. 1995) .......... 17

United States v. Alferahin,
433 F.3d 1148 (9th Cir. 2006) .......... 37, 38, 42

United States v. Al-Kurna,
808 F.2d 1072 (5th Cir. 1987) .......... 40

United States v. Begay,
673 F.3d 1038(9th Cir. 2011) .......... 26

United States v. Boulware,
558 F.3d 971 (9th Cir. 2009) .......... 31

United States v. Caldwell,
989 F.2d 1056 (9th Cir. 1993) .......... 31

United States v. Campos,
217 F.3d 707 (9th Cir. 2000) .......... 30, 35

United States v. Chang Da Liu,
538 F.3d 1078 (9th Cir. 2008) .......... 56

United States v. Chen,
324 F.3d 1100 (9th Cir. 2003) .......... 39

United States v. Cruz,
554 F.3d 840 (9th Cir. 2009) .......... 17

United States v. Del Toro-Barboza,
673 F.3d 1136 (9th Cir. 2012) .......... 26

United States v. Fairchild,
990 F.2d 1139 (9th Cir. 1993) .......... 20

United States v. Gadson,
763 F.3d 1189 (9th Cir. 2014) .......... 29

United States v. Garcia-Ochoa,
607 F.3d 371 (4th Cir. 2010) .......... 39, 40

United States v. Garcia-Santana,
774 F.3d 528 (9th Cir. 2014) .......... 46

United States v. Gaudin,
515 U.S. 506 (1995) .......... 39

United States v. Gomez,
757 F.3d 885 (9th Cir. 2014) .......... 46

United States v. Gonzalez-Aparicio,
663 F.3d 419 (9th Cir. 2011) .......... 30, 35

United States v. Hadeed,
376 F. App'x 335 (4th Cir. 2010) .......... 39

United States v. Haeng Hwa Lee,
602 F.3d 974 (9th Cir. 2010) .......... 19

United States v. Harris,
185 F.3d 999 (9th Cir. 1999) .................................................. 44, 47, 48, 53

United States v. Heck,
499 F.2d 778 (9th Cir. 1974) .................................................................. 46

United States v. Jinian,
725 F.3d 954 (9th Cir. 2013) .................................................................. 29

United States v. Kessi,
868 F.2d 1097 (9th Cir. 1989) ................................................................ 30

United States v. Keyser,
704 F.3d 631 (9th Cir. 2012) ........................................................... 31, 40

United States v. Kone,
307 F.3d 430 (6th Cir. 2002) .................................................................. 40

United States v. Little,
753 F.2d 1420 (9th Cir. 1984) ................................................................ 46

United States v. Mateo-Mendez,
215 F.3d 1039 (9th Cir. 2000) ................................................................ 16

United States v. Matsumaru,
244 F.3d 1092 (9th Cir. 2001) ................................................................ 40

United States v. Moore,
109 F.3d 1456 (9th Cir. 1997) ......................................................... 48, 49

United States v. Morrison,
529 U.S. 598 (2000) ....................................................................... 54, 60

United States v. Munoz,
412 F.3d 1043 (9th Cir. 2005) ......................................................... 41, 42

United States v. Nelson,
471 F. App'x 638 (9th Cir. 2012) ........................................................... 19

United States v. Nevils,
598 F.3d 1158(9th Cir. 2010) ................................................ 18, 19, 25, 26

United States v. Osife,
398 F.3d 1143 (9th Cir. 2005) ................................................................ 50

United States v. Pacheco-Zepeda,
234 F.3d 411 (9th Cir. 2000) .................................................................. 50

United States v. Pelisamen,
641 F.3d 399 (9th Cir. 2011) .................................................................. 30

United States v. Peterson,
538 F.3d 1064 (9th Cir. 2008) ................................................................ 39

United States v. Puerta,
982 F.2d 1297 (9th Cir. 1992) ................................................................ 36

United States v. Rodman,
776 F.3d 638 (9th Cir. 2015) .................................................................. 32

United States v. Rodriguez-Preciado,
399 F.3d 1118 (9th Cir. 2005) ................................................................ 16

United States v. Rossi,
299 F.2d 650 (9th Cir. 1962) ........ 27, 36
United States v. Shea,
493 F.3d 1110 (9th Cir. 2007) ........ 26
United States v. Tucker,
133 F.3d 1208 (9th Cir. 1998) ........ 17
United States v. Tuohey,
867 F.2d 534 (9th Cir. 1989) ........ 33
United States v. U.S. Dist. Court for the NMI,
694 F.3d 1051 (9th Cir. 2012) ........ 55
United States v. Valencia,
492 F.2d 1071 (9th Cir. 1974) ........ 19
United States v. Wei Qin Sun,
399 F. App'x 319 (9th Cir. 2010) ........ 54, 55
United States v. Weiland,
420 F.3d 1062 (9th Cir. 2005) ........ 50
United States v. Windsor,
570 U.S. ___, 133 S. Ct. 2675 (2013) ........ 43, 49, 50
United States v. Wu,
419 F.3d 142 (2d Cir. 2005) ........ 40
United States v. Yoo Taik Kim,
518 F. App'x 537 (9th Cir. 2013) ........ 38
Zemeka v. Holder,
989 F. Supp. 2d 122 (D.D.C. 2013) ........ 51

Constitutional Provisions

U.S. Const. art. III ........ 52, 61

Statutes

8 U.S.C. § 1182(a)(6)(C)(i) ........ 41
8 U.S.C. § 1255(a)(2) ........ 41
18 U.S.C. § 2(b) ........ 19
18 U.S.C. § 371 ........ passim
18 U.S.C. § 922(a)(6) ........ 48
18 U.S.C. § 1001(a)(2) ........ 3, 11
18 U.S.C. § 1027 ........ 47
18 U.S.C. § 1425 ........ 37, 38
18 U.S.C. § 1425(a) ........ 37
18 U.S.C. § 1546(a) ........ passim
18 U.S.C. § 3231 ........ 1
28 U.S.C. § 1291 ........ 1

28 U.S.C. § 1294 ........ 1
48 U.S.C. § 1694(a) ........ 1
48 U.S.C. § 1801 ........ 56
48 U.S.C. § 1821 ........ 1, 43, 51, 57
48 U.S.C. § 1821(b)(1) ........ 52
48 U.S.C. § 1822 ........ 1, 57, 58

Rules

Fed. R. App. P. 4(b) ........ 1
Fed. R. App. P. 32(a)(7)(B) ........ 1
Fed. R. App. P. 32(a)(7)(C) ........ 1

Other Authorities

Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ........ 56, 57
Department of the Interior, *Section-by-Section Analysis of the Covenant* ... 59
Marianas Political Status Commission, *Section-by-Section Analysis of the Covenant* ........ 58, 59
Model Penal Code ........ 46

No. 14-10277

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

v.

**XIAOYING TANG DOWAI,**

*Defendant-Appellant.*

# ANSWERING BRIEF OF THE UNITED STATES

## I. JURISDICTION, TIMELINESS & BAIL

This appeal arises from the criminal prosecution of Defendant-Appellant Xiaoying Tang Dowai ("Tang"). The district court had (contested) jurisdiction under 48 U.S.C. §§ 1821 and 1822, and under 18 U.S.C. § 3231. Tang filed a timely notice of appeal on June 6, 2014. AER[1] 16; Fed. R. App. P. 4(b). This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1294 and 48 U.S.C. § 1694(a).

Tang was sentenced to a two-year term of probation. AER 19. Her term of probation is projected to run out in May of 2016.

[1] Throughout, "AER" denotes the Appellant's excerpts of record; "AOB" denotes the Appellant's opening brief; and "GER" denotes the government's (supplemental) excerpts of record. Some personal information is redacted.

## II. ISSUES

This appeal arises from a conviction by jury trial, and raises a total of four issues, all of which bear on Tang's conviction:

(1) Was the circumstantial evidence sufficient for the jury to have found that Tang knew that a certain representation was made in a Form I-130 under penalty of perjury?

(2) Did the district court reversibly err in refusing to give the inapposite jury instructions that Tang asked for?

(3) Did the district court err in denying the motion to dismiss the indictment, insofar as it was based on the contention that the offenses charged are unconstitutional because they (a) are unconstitutionally vague, and (b) violate due process under the 2013 Supreme Court case *United States v. Windsor*?

(4) Did the district court err in denying the motion to dismiss the indictment, insofar as it was based on the contention that the statute setting up the district court in which she was prosecuted is unconstitutional because it denies her an Article III judge?

With this brief, the government also files a Circuit Rule 28-2.7 Addendum, which is introduced by a table of contents and will be bound separately.

*** * ***

## III. STATEMENT OF THE CASE

### A. Introduction

This appeal arises from Tang's conviction on three criminal charges: conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; visa fraud, in violation of 18 U.S.C. § 1546(a); and false statement, in violation of 18 U.S.C. § 1001(a)(2).

In 2009, Tang, a citizen of China, married Jesse J.T. Dowai, a citizen of the United States. The marriage's principal purpose—perhaps even its sole purpose—was to get Tang a "green card." In 2011, Tang and Dowai applied to U.S. Citizenship and Immigration Services ("USCIS") for Tang's "green card." Their application misrepresented, among other things, Tang and Dowai's living situation: they said that they lived together, when they did not. And in 2012, when Tang and Dowai had their interview with USCIS in connection with their application, they persisted in that misrepresentation. Tang's three charges were based on this conduct.

In this appeal, Tang challenges: the sufficiency of the evidence underlying her visa fraud conviction; the district court's denial of her proposed jury instructions; the constitutionality of the offenses charged; and the constitutionality of the statute that sets up the district court in which she was prosecuted.

### B. The Criminal Conduct

#### 1. Background

Tang, a citizen of China, came to the island of Saipan in the Commonwealth of the Northern Mariana Islands ("CNMI") in 2002. GER 212. For about seven years, she enjoyed lawful immigration status (under the now-defunct CNMI immigration regime) based on a series of employment contracts. GER 212-13. But in 2009, the contracts ran out, and Tang's lawful immigration status came into peril. GER 214-15.

#### 2. The meeting

Around that time, Saipan resident and U.S. citizen Jesse J.T. Dowai met "Chico"—"[a] Bangladeshi guy"—at a Mobil gas station. GER 131, 347-48. "Chico" asked Dowai if he wanted to marry a Chinese woman for money, with the notion being that the marriage would help the woman "extend her work permit." GER 131-33. Dowai was amenable, and when the introduction took place, "Chico" said to Dowai: "This is the Chinese lady that you will be marrying." GER 132. The "Chinese lady" was Tang, and "Chico" was her boyfriend, Md. Shahadat Hossain. GER 129-132, 144, 165, 176-77, 225, 392.

#### 3. The marriage

Tang and Dowai married on September 3, 2009. GER 357. Hossain was present for the wedding, and gave Dowai $500. GER 134.

#### 4. Married life

After they married, Tang and Dowai never lived together and never spent any time together in the absence of Hossain. GER 144. Tang and Hossain would sometimes give Dowai little gifts—cigarettes, betel nut, ten dollars—but only in response to a call from Dowai. GER 150-51 ("It's not that she was willing to bring me things. It's only when I call to ask for something, and they would show up."). And these calls went from Dowai to Hossain, rather than to Tang. GER 150.

Tang kept her distance. She told Dowai that they had a joint account at the Bank of Guam, but didn't give him access to it. GER 141, 366. And sometimes Dowai would try to give Tang a hug, or encourage her to stay with him at his house, but she would recoil. GER 156. Thus, Dowai sometimes felt like Tang wasn't honest or truthful with him. GER 156.

#### 5. The green card application

After two years, Tang applied to USCIS for lawful permanent resident status—*i.e.*, for a "green card." GER 350-55, 49. This application comprised the following documents, among others:

- ***I-130 Petition for Alien Relative, with supporting G-325A***. Tang and Hossain gave Dowai this document to sign, which he signed without reading on September 28, 2011. GER 136, 347-49. When

they gave it to him, "they told [him] it was for the status of the marriage." GER 136. Item 21 in Part C states that Tang and Dowai "lived together" on McArthur Street in the village of Gualo Rai from October 1, 2009, to "present." GER 348. Immediately above Item 21, Tang's home address in China appears in handwritten Chinese characters. *Id*. Dowai couldn't read these Chinese characters. GER 137-38. The Chinese characters are also about half a page up from the penalty-of-perjury warning at the end of the I-130. GER 348.

- ***I-485 Application to Register Permanent Residence or Adjust Status, with supporting G-325A***. Tang signed this document on September 28, 2011. GER 350-56. Above her signature is the penalty-of-perjury warning. GER 355. Also above her signature is the following statement, with a checked box next to it: "I can read and understand English, and I have read and understand each and every question and instruction on this form, as well as my answer to each question." *Id*. Beneath that is a statement for a person who relied on a translator; the box next to that is not checked. *Id*.

- ***I-864 Affidavit of Support***. This document was signed by Katherine Q. Casil on October 3, 2011. GER 358-65, 56-57. Casil

was a friend of Hossain's and Tang's GER 175-77. When, in the course of the case, she learned that the I-864 was submitted in connection with Tang's marriage to a man she had never met, Casil said she was "disappointed . . . because I trusted her and I didn't know that she was married." GER 178.

- ***Tang-Dowai marriage license***. This document was executed in August/September of 2009. In it, Tang represented that she lived at the "Casa de Filipe" apartment in Garapan. GER 357. At trial, Dowai testified that he had lived at the "Casa de Felipe" apartment in Garapan, but that he had lived there by himself. GER 138-39.
- ***Joint Tang-Dowai tax returns for tax years 2010 and 2009***. Both of these tax returns were signed under penalty of perjury on October 4, 2011. GER 367-76, 373.
- ***Life insurance policy***. Tang took out this life insurance policy on December 7, 2011, with Dowai as the beneficiary. GER 377-81.
- ***Posed photographs***. These were some photographs of Tang and Dowai posing together as a couple—*i.e.*, with arms around each other—taken on the same day. GER 382, 134-35.
- ***Ali "Certification of Stay."*** This is a February 2, 2012 notarized document from a certain Md. Ayub Ali—Tang and Hossain's

landlord—purporting to certify that Tang and Dowai had been living together at Ali's apartment in Gualo Rai for about a year and a half. GER 383, 76-77. Dowai had never lived at Tang's house in Gualo Rai. GER 137. Hossain and Tang had in fact stayed together in the same room at Ali's apartment in Gualo Rai, from July 2010 to March 2013, during which time they had a baby together. GER 165-68. Hossain was responsible for the notarized document, which Ali couldn't read. GER 166-67.

- ***Yu "Affidavit."*** This is a February 6, 2012 notarized document from Wei Hong Yu—apparently a friend of Tang's—"vouch[ing]" that Tang and Dowai "are bonafide husband and wife," and stating, among other things, that Yu had been visiting Tang and Dowai at their residence in Gualo Rai twice a month for about a year and a half. GER 384, 77.

**6. The USCIS interview**

On February 6, 2012, Tang and Dowai had their interview with USCIS regarding Tang's green card application. GER 46.

Before the interview, Tang and Hossain met with Dowai for a prep session. GER 142. Hossain told Dowai to say that he (Dowai) and Tang were married, that they were living together and that they loved each other.

GER 143. Tang told Dowai that her panties were red, "because they might bring that kinds of questions [*sic*] up." GER 143.

Officer Diane Zedde conducted the interview. GER 46-49. She started by putting Tang and Dowai under oath. GER 41, 78-79. She then interviewed them separately. GER 79-80. Officer Zedde noticed some problems in their interviews. For example, Dowai was unable to pronounce his wife's name or to give the date of their marriage. GER 82. Dowai said that he had paid the fees associated with the USCIS application, and that they amounted to about $100, but Tang said that she had paid the fees, and that they amounted to about $1,500. And when asked about what they had done the previous day, Dowai said that they had gone to the beach and then watched a movie, but Tang said that she was at work until late 4:00 PM, and that after work either she or Dowai went to someone's house and didn't return until 11:00 PM. GER 82-83.

Both Tang and Dowai said that they lived together. GER 89-90. Tang specifically said that they had lived together since marriage. GER 90.

Based on the problems she saw, Officer Zedde re-interviewed Dowai. GER 83. During this second interview, Officer Zedde confronted Dowai with the gist of the problems. GER 84-85. Dowai "let out a big sigh [and]

dropped his head." GER 85. From then on, Dowai told a different story, and Officer Zedde "could see he was more relaxed." GER 87.

### 7. Aftermath

After the USCIS interview, Tang and Hossain had no further contact with Dowai. GER 144. On March 12, 2013—shortly before Homeland Security Investigations ("HSI") agents interviewed her in connection with this case—Tang filed a petition for divorce from Dowai. GER 387-88, 393-96. Tang never spoke with Dowai about divorce. GER 144. In the petition, she declared under penalty of perjury that she and Dowai had been separated since November of 2011. GER 387-88, 397-98. Divorce was granted on May 6, 2013. GER 397-98.

HSI agents interviewed Tang in connection with this case, and took her written statement, on or about March 22, 2013. GER 395-96, 182-95. In the statement, Tang stated that she and Dowai had "lived together in Garapan" for "seven months," at a place she believed was named "Casa Apartments." GER 395. Tang also stated that her marriage to Dowai "was a real marriage," that she divorced Dowai because he had started drinking and would not come home at night, that she didn't know why Dowai had told HSI agents that their marriage was fraudulent, and that she didn't know why Dowai's family had said that they didn't know her. GER 395.

### C. The Procedural History

#### 1. Pre-trial

Tang was indicted on October 22, 2013. AER 393. She moved to dismiss the indictment on constitutional grounds, but the district court denied the motion at a January 7, 2014 hearing. AER 11.

The first superseding indictment came down on January 21, 2014. AER 389. This first superseding indictment contained the charges on which the parties went to trial, which were: Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); Visa Fraud, in violation of 18 U.S.C. § 1546(a) (Count 2); and False Statement, in violation of 18 U.S.C. § 1001(a)(2) (Count 3). *Id.* The district court denied Tang's motion to dismiss the first superseding indictment. AER 383.

#### 2. Trial

The three-day jury trial started on January 27, 2014. Tang's motion at trial for a judgment of acquittal as to Count 2 was denied. ER 129-30, 301-10. Tang's proposed jury instructions on the issues of "materiality" and "marriage" (AER 133, 386-88) were also denied. AER 26-27. The jury found Tang guilty of all three charges against her. AER 18.

The Government presented six witnesses at trial: Officer Zedde, Dowai, Ali, Casil, translator Xiaohua "Monique" Kramer, and the case agent, HSI Special Agent Michael Lansangan. GER 72.

Officer Zedde's testimony covered, among other things, the "materiality" of Tang's false statements to USCIS. GER 89-94; 204-06. Likewise, Special Agent Lansangan's testimony covered, among other things, the "materiality" of Tang's false statements to HSI. GER 195-96.

Tang did not make any motion for a judgment of acquittal at the close of the Government's evidence (GER 207-212), but did make such a motion—as to Count 2, specifically—at the close of all evidence (GER 238-41), which motion was denied (AER 130).

Tang took the stand. During her testimony, Tang said, among other things, that she had married Dowai in order to get a work permit (GER 215); that she and Dowai had never lived together (GER 220-21); that she had not wanted to live with Dowai because she did not love him, did not like his betel-nut-chewing habit, did not like his house, and, finally, because she had a boyfriend, and "just did not want this thing made complicated" (GER 221); that she had lied to USCIS and HSI (GER 227); that she was willing to do what was necessary to get a green card (GER 223); and that she had divorced Dowai because the green card application was denied and she had a baby with Hossain (GER 224). Even so, she asserted, in response to a yes-or-no question, that, at the time that she married Dowai, she had intended to establish a life with him. GER 219.

### 3. Post-trial

Defendant filed post-trial motions for judgment of acquittal and arrest of judgment, which were denied. AER 1. On May 25, 2014, Defendant was sentenced to a term of two years' probation. AER 19.

*** * ***

## IV. SUMMARY OF THE ARGUMENTS

***First***, the evidence was sufficient for the jury to have found that Tang knew that a certain representation was made in the Form I-130 under penalty of perjury. The jury had before it ample circumstantial evidence with which to reach that finding by way of reasonable inferences.

***Second***, there was no reversible error in the jury instructions. A Section 371 conspiracy-to-defraud-the-United-States charge has no "materiality" element, and the district court therefore correctly refused to give Tang's proposed jury instruction to the contrary. Likewise, Tang's proposed "materiality" instruction, being rooted in the distinct definition that "materiality" has in the denaturalization context, did not set forth appropriate principles of law for the jury to apply to the facts of this criminal false statement case, so the district court therefore correctly refused to give that proposed instruction. And even if the contentions summarized in the previous two sentences are mistaken, any instructional error was harmless, because no rational jury could have failed to find that the evidence presented fell short of the standard articulated in Tang's proposed instructions.

***Third***, the district court correctly denied Tang's motion to dismiss, to the extent it was based on the constitutionality of the charges. Tang's void-for-vagueness argument fails because (a) she does not attack the actual

charging statutes, (b) she makes no attempt to reconcile her lack-of-notice theory with her admittedly deliberate deceitful conduct, and (c) this Court has held (i) that Section 371 has no void-for-vagueness problem, and (ii) that that statutes analogous to Sections 1001 and 1546 have no such problem. And Tang's *Windsor*-based argument fails because *Windsor* had no effect on *Lutwak* and *Bark* (accepting *arguendo* the premise that those two cases must remain good law in order for the charges in this case to be constitutional).

***Fourth***, the district court correctly denied Tang's motion to dismiss, to the extent it was based on the constitutionality of the statute that sets up the district court in which she was prosecuted. Tang recognizes that there exist courts excepted from Article III, but fails to discharge her "considerable" burden of making a "plain showing" that the District Court for the Northern Mariana Islands cannot be among them. In particular, she fails to explain (a) why this Court was wrong to reject, in a previous case, the very same argument she make here, and (b) why Section 1821 cannot survive the *De Leon Guerrero* balancing test, and thus be deemed a lawful exercise of Congress's power under Section 105 of the Covenant.

* * *

## V. ARGUMENTS

### A. The Evidence Was Sufficient to Sustain Tang's Conviction on Count 2

Tang first challenges the district court's denial of her sufficiency-of-the-evidence-based motion for judgment of acquittal on Count 2. AOB 10.

Count 2 charged Tang with visa fraud, in violation of Title 18, United States Code, Section 1546(a), fourth paragraph. AER 396. The theory of Count 2 is that Dowai made a materially false statement in his I-130 by stating in Item 21 that he and Tang had "lived together" at some point, and that Tang is criminally answerable for this false statement because she wilfully caused Dowai to make it. GER 348.

Tang's challenge on this point is narrow: she admits that the cohabitation representation was indeed false (AOB 12), and allows[2] that the jury could have found the representation to be material under the "materiality" instruction given (though she contends, in a separate argument, that the "materiality" instruction given was legally inadequate (AOB 14-23)). Her only argument here is that there was insufficient evidence for the jury to have found that (1) she knew that the cohabitation representation was

[2] At least, she does not "specifically and distinctly" argue that the jury could not have found the representations to be material under the "materiality" instruction that was actually given at trial. *See, e.g.*, *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1126 (9th Cir. 2005); *United States v. Mateo-Mendez*, 215 F.3d 1039, 1043 (9th Cir. 2000).

in the I-130, and (2) she knew that the representation was made under penalty of perjury. AOB 12-14.

Both claims lack merit. Rather, there was sufficient evidence—not overwhelming evidence, to be sure, but sufficient evidence—for the jury to have found in favor of the government on both points. The district court thus correctly denied her motion for a judgment of acquittal on Count 2, and this Court should affirm that decision.

**1. Standard of review**

When a district court denies a motion for judgment of acquittal based on sufficiency of the evidence, this court reviews that denial de novo. *See United States v. Tucker*, 133 F.3d 1208, 1214 (9th Cir. 1998). And because Tang presented evidence on her own behalf, "all the evidence—including the evidence presented by the defendant—can be considered in this analysis." *United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009) (quoting *United States v. Alexander*, 48 F.3d 1477, 1490 n.10 (9th Cir. 1995)).

**2. Applicable Law**

**(i) Test**

Evidence is sufficient to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

When reviewing the sufficiency of evidence under *Jackson*, this Court follows "a two-step inquiry." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First, "[it] must consider the evidence presented at trial in the light most favorable to the prosecution." *Id*. at 1164. The Court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *Id*. "Rather, when 'faced with a record of historical facts that supports conflicting inferences' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. (quoting *Jackson*, 443 U.S. at 326).

Second, "after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow *any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." *Nevils*, 598 F.3d at 1164 (quotation marks omitted; emphasis and brackets in original). Thus, "the question is not whether the evidence excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive at its conclusion." *Id*. at 1165 (quotation marks omitted).

At bottom, "the only question under *Jackson* is whether [the jury's verdict is] so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. ___, 132 S. Ct. 2060, 2065 (2012). It follows that "[a] jury's verdict must stand unless evidence, properly construed in the government's favor, is 'so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt.'" *United States v. Nelson*, 471 F. App'x 638, 641 (9th Cir. 2012) (quoting *Nevils*, 598 F.3d at 1167).

**(ii) Substantive law**

The Addendum sets forth the relevant text of 18 U.S.C. § 1546(a).

"Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b). "In other words, a principal is guilty of an offense if she used 'an innocent pawn to cause an act to be done which, if performed by the principal, would be unlawful.'" *United States v. Haeng Hwa Lee*, 602 F.3d 974, 976 (9th Cir. 2010) (quoting *United States v. Valencia*, 492 F.2d 1071, 1074 (9th Cir. 1974)).

This Court has held a defendant criminally liable for false statements made by another person when the defendant set in motion a process which he intended would be completed by someone else making the false

statements for his benefit. *See United States v. Fairchild*, 990 F.2d 1139, 1141-42 (9th Cir. 1993).

### 3. Argument

There was sufficient evidence for the jury to have found that (1) Tang knew that the cohabitation representation was in the I-130, and (2) she knew that the representation was made under penalty of perjury.

The jury had before it the following facts, among others:

1. Tang had married Dowai to get a work permit. GER 215.
2. Tang was not spontaneously generous to Dowai. GER 144.
3. Tang told Dowai that they had a joint account at the Bank of Guam, but didn't give him access to it. GER 141, 366.
4. Tang would reject Dowai's attempts at intimacy, and would sometimes make him feel like she wasn't honest or truthful with him. GER 156.
5. Tang "just did not want this thing [*i.e.*, her marriage to Dowai] made complicated." GER 221.
6. Tang divorced Dowai because her green card application had been denied and she had a baby with Hossain. GER 224.
7. Tang was willing to do what was necessary to get a green card. GER 223.

8. Among the documents that went to USCIS were some photographs of Tang and Dowai posing together as a couple. GER 382, 134-35.

9. During the prep session before the 2012 USCIS interview, Tang told Dowai that her panties were red. GER 143.

10. In the 2009 marriage license, it was falsely represented that Tang lived at the "Casa de Filipe" apartment in Garapan. GER 357, 356, 138-39.

11. In her 2013 written statement to HSI, Tang falsely said, among other things, that she and Dowai had "lived together in Garapan" for "seven months," at a place she believed was named "Casa Apartments." GER 395.

12. In the tax returns and life insurance policy that went to USCIS in connection with Tang's I-485, it was falsely represented that Tang and Dowai shared an address. GER 367-76, 377-81.

13. In the Ali "Certification of Stay," it was falsely represented that Tang and Dowai had lived together. GER 383, 76-77.

14. In the Yu "Affidavit," it was falsely represented that Tang and Dowai had been living together. GER 384, 77.

15. During the prep session before the 2012 USCIS interview,

Hossain told Dowai—in Tang's presence—to say that he (Dowai) and Tang were living together. GER 142-43.

16. During the 2012 USCIS interview, Tang testified under oath that, among other things, she and Dowai had lived together since marriage. GER 90.

17. Item 21 in Part C of the I-130 contains the offending "lived together" representation. Immediately above Item 21, Tang's home address in China appears in handwritten Chinese characters, which Dowai couldn't read. GER 348; 137-38.

18. Tang and Hossain gave Dowai the I-130 to sign. GER 136, 347-49. When they gave it to him, "they told [him] it was for the status of the marriage." GER 136.

19. Above Tang's signature on her I-485 is the following statement, with a checked box next to it: "I can read and understand English, and I have read and understand each and every question and instruction on this form, as well as my answer to each question." GER 355. Beneath that is a statement for a person who relied on a translator; the box next to that is not checked. *Id*.

These facts constitute sufficient evidence for the jury to have found that Tang knew that the cohabitation representation was in the I-130. From facts 1-8, the jury could infer that Tang wanted nothing to do with Dowai beyond what was necessary to obtain the immigration-related benefits she sought, and was ready to abandon the marriage as soon as it became clear she couldn't get what she wanted. With facts 9 and 10 added in, the jury could infer that Tang also understood that, to get what she wanted out of the marriage, she needed evidence that would misrepresent how things were between her and Dowai by exaggerating their intimacy in the eyes of USCIS. From facts 11-17, the jury could see that one way Tang had met that need was by repeatedly advancing the lie that she and Dowai had cohabited at some point—a lie she not only perpetrated from the very outset of the marriage in 2009 but remained committed to as late as 2013. Finally, from facts 18-20 the jury could see not only that Tang had handled the I-130, but that she had written on it, and had been able to read it because she could "read and understand English." By considering these last three facts in the light of Tang's overall attitude toward the marriage and in the light of Tang's commitment to the lie that she and Dowai had cohabited, the jury could infer that Tang had in fact read the I-130, and so knew what it said.

Likewise, there was sufficient evidence for the jury to have found that Tang knew that the cohabitation representation was made under penalty of perjury. Continuing the list begun above, the government will note that jury also had before it the following facts, among others:

20. The tax returns that went to USCIS were executed under penalty of perjury. GER 367-76, 377-81.

21. The Ali "Certification of Stay" that went to USCIS was notarized. GER 383, 76-77.

22. The Yu "Affidavit" that went to USCIS was notarized. GER 384, 77.

23. On Tang's I-485, there is a penalty-of-perjury warning just above her signature. GER 355.

24. Above Dowai's signature on the I-130 is the penalty-of-perjury warning. GER 348.

These facts and the others previously listed constitute sufficient evidence for the jury to have found that Tang knew that the cohabitation representation was made under penalty of perjury. From facts 21-23, the jury could infer that Tang generally knew it was important that the information submitted to USCIS be guaranteed in some way. From facts 24 and 20, the jury could infer that Tang specifically knew that her I-485, and all the information

provided with it, was certified as true and correct under penalty of perjury. From the facts highlighted thus far in this paragraph, the jury could infer that Tang probably knew that everything in the I-130 had to be certified as true and correct under penalty of perjury, given the general importance that information submitted to USCIS be guaranteed in some way, and given the likeness between, and complementarity of, the I-130 and the I-485. Finally, with facts 1-8, 25, and 18 added in, the jury could infer that Tang did in fact know that everything in the I-130 was certified as true and correct under penalty of perjury. She had clearly handled the I-130 (when she wrote her address on it), and so had clearly had an opportunity to read it. She had the ability to read it, because she could "read and understand English." And, above all, she had a powerful motive to read it: she was the one who stood to gain from having the I-130 adjudicated in her favor, and so would have wanted to know exactly what information this all-important document was supposed to contain, in order to maximize her odds of success by making sure it was properly filled out.

Tang's argument for the insufficiency of the evidence on Count 2 lacks merit. In general, her presentation of "the sum total of what the evidence shows about the I-130" (AOB 12) is too parsimonious to pass muster under the first step of sufficiency review. *See Nevils*, 598 F.3d at

1164. In particular, she contends that "one can only speculate whether Ms. Tang was even literate in English" (AOB 14), which contention is incorrect because the record contains Tang's statement that she could "read and understand English" (see fact 20); if this evidence should be thought in conflict with any other evidence in the record, this Court is to presume "that the trier of fact resolved any such conflicts in favor of the prosecution." *Nevils*, 598 F.3d at 1164.

Tang also does not consider the role that motive evidence should play here. "[E]vidence of motive . . . often helps to establish a given defendant's guilt[.]" *United States v. Begay*, 673 F.3d 1038, 1045 (9th Cir. 2011) (en banc). *See also, e.g.*, *United States v. Shea*, 493 F.3d 1110, 1117 (9th Cir. 2007) (evidence sufficient partly because of motive evidence). A green card was the main thing—perhaps the ***only*** thing—that Tang wanted out of her marriage to Dowai. This being so, she had a motive to ensure that her I-130 was successfully adjudicated.

Finally, Tang seems to suggest that a series of inferences cannot pass the "chain-of-logic" test unless they are all but inexorable. However, the law shows that a "chain of logic" can be built of reasonable, permissive inferences from circumstantial evidence. *See, e.g.*, *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1144-46 (9th Cir. 2012). The reasoning

outlined above thus constitutes a "chain of logic," and so constitutes a path the jury could reasonably have taken from the evidence to the verdict.

With regard to the element of Count 2 that Tang puts at issue, the government does not say that its evidence was "overwhelming." It wasn't. But, as argued, it was clearly sufficient. The district court therefore correctly denied Tang's motion for a judgment of acquittal on Count 2.

### B. There Was No Reversible Error in the Jury Instructions

Next, Tang challenges the district court's rejection of her proposed jury instructions. AOB 14-23.

Tang contends that, in any immigration-related case, "a fact suppressed or misstated" can be "material" only if "it is one which, if known, would have justified a refusal to issue the visa, or one which, if known, would have raised a fair inference that a statutory disqualifying fact actually existed." AOB 18 (citing *Kungys v. United States*, 485 U.S. 759, 783 (1988) (Brennan, J., concurring); *United States v. Rossi*, 299 F.2d 650, 652-53 (9th Cir. 1962)). Tang asked the district court to so instruct the jury, but the district court refused to do so, and Tang claims that this was error. AOB 14-23. This claim must be decomposed into two parts.

The first part of this claim is that the jury should have been instructed that "materiality" was an element of all three offenses charged. AOB 15.

Agreeing with the government that there is no "materiality" element in a Section 371 conspiracy to defraud the United States, the district court only instructed the jury on "materiality" as to the Section 1546 visa fraud and Section 1001 false statement charges. Tang asserts error on that point.

The second part of this claim is that "materiality" should have been defined for the jury in this case just as it's defined in a denaturalization case.[3] AOB 15-23. Agreeing with the government that the special definition "materiality" has in the denaturalization context is, in fact, confined to the denaturalization context, and that Instructions 8.134 and 8.73 of the Ninth Circuit Manual of Model Criminal Jury Instructions accurately state the law on "materiality" in the criminal false statement context, the district court rejected Tang's proposed definition of "materiality" and instead defined the term for the jury just as it's defined in those model criminal instructions. Tang asserts error on that point too.

Neither part of Tang's jury-instruction claim is correct. There is no "materiality" element in a Section 371 conspiracy to defraud the United States, and Tang's proposed "materiality" instruction did not set forth appropriate principles of the law for the jury to apply to the facts of this

[3] Tang also mentions the district court's refusal to instruct the jury on the term "marriage," but that issue drops out of the analysis, because it is only in virtue of Tang's proposed definition of "materiality" that a definition of "marriage" might even be needed.

case. Rather, the instructions that the district court actually gave—which were based on Instructions 8.134 and 8.73 of the Ninth Circuit Manual of Model Criminal Jury Instructions—accurately stated the law on "materiality" in the criminal false statement context. The district court therefore correctly rejected the proposed instruction, which decision this Court should affirm. And even if the district court erred here, the error was harmless, because no rational jury could have failed to find that the evidence presented did not meet the standard Tang claims was applicable.

### 1. Standard of Review

This Court reviews de novo the claims that Tang raises as to the jury instructions, except for one particular aspect of one of those claims. *See United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013).

The one exception is Tang's claim that the district court should have instructed the jury that there is a "materiality" element in a Section 371 conspiracy to defraud the United States because "[a] materiality requirement is also inherent in the statutory term 'obstruct.'" AOB 15 n.13. This particular claim should be reviewed for plain error because, as far as the government can tell, Tang did not argue that particular ground for such a requirement in the district court. *See United States v. Gadson*, 763 F.3d 1189, 1215 (9th Cir. 2014) ("Neither Gadson nor Wilson raised this

particular objection to the *Pinkerton* instruction, and so our review is for plain error."); *United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir. 1989) ("To preserve the right to appellate review of this [jury instruction], Kessi must have objected properly in the district court. [Rule] 30 prohibits a party from assigning error "unless that party objects thereto before the jury retires to consider the verdict, stating ***distinctly*** the matter to which that party objects and the ***grounds*** of the objection.") (emphasis in original).

"The plain-error standard of review dictates that reversal is warranted only where there has been (1) error; (2) that is plain; (3) that affects substantial rights; and (4) where the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Pelisamen*, 641 F.3d 399, 404 (9th Cir. 2011). "To be plain, the error must be clear or obvious, and an error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." *United States v. Gonzalez-Aparicio*, 663 F.3d 419, 428 (9th Cir. 2011) (quotation marks omitted). *See also United States v. Campos*, 217 F.3d 707, 713 (9th Cir. 2000) ("to constitute 'plain error,' the error must be 'plain' or clear on its face under current law" and where this Court "ha[s] not yet approved" or "disapproved" of issues raised for the first time on appeal, there can be no plain or clear error).

### 2. Applicable Law

The Addendum sets forth the relevant text of 18 U.S.C. § 371.

When an appellant challenges rejection of her proposed jury instructions, the question is whether those proposed instructions set forth "appropriate principles of the law for the jury to apply to the facts." *United States v. Keyser*, 704 F.3d 631, 642 (9th Cir. 2012) (brackets and quotation marks omitted). *See also United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (for defendant to get proposed instructions on her theory of the case, that theory must be "legally cognizable" and "legally sound").

### 3. Argument

#### (i) There is no "materiality" element in a Section 371 conspiracy to defraud the United States

There is no "materiality" element in a Section 371 conspiracy to defraud the United States. Neither the word "material" nor the word "materiality" appears in the text of the statute. *See* 18 U.S.C. § 371. Indeed, the statute penalizes conspiracies to defraud the United States, or any agency thereof, "in any manner"—not, for example, "in any material manner."

Likewise, neither the word "material" nor the word "materiality" appears in the text of this Court's leading opinion on a Section 371 conspiracy to defraud the United States. *See United States v. Caldwell*, 989 F.2d 1056, 1058-59 (9th Cir. 1993) ("To convict someone under [Section]

371 the government need only show (1) he entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy."). *See also*, *e.g.*, *United States v. Rodman*, 776 F.3d 638, 642 (9th Cir. 2015) ("[A] a conspiracy need not . . . involve any detrimental reliance by the government, or involve independently illegal goals or means. . . . Thus, the submission of fraudulent forms to a governmental agency by two or more persons when those fraudulent forms impede that agency's lawful functions constitutes a conspiracy under 18 U.S.C. § 371.").

Tang argues that since Section 371 uses the word "defraud," there must necessarily be a "materiality" element in a Section 371 conspiracy to defraud the United States, because any statute using that word "inherently includes a requirement of materiality, even if the statute contains no explicit mention of it, unless such a requirement would clearly be inconsistent with the statute." AOB 15 n.13 (citing *Neder v. United States*, 527 U.S. 1, 20-26 (1999)). While her legal premise may be generally correct, her conclusion as to the Section 371 offense at issue is incorrect.

Under *Neder*, when a federal statute contains the word "defraud," an interpreting court is to "***presume*** that Congress intended to incorporate materiality, unless the statute otherwise dictates." *Neder*, 527 U.S. at 23

(emphasis in original; quotation marks omitted). One way to show that the statute "otherwise dictates" is to show that it "encompasses more than common-law fraud." *Id*. at 24.

In the case of the language in Section 371 creating the offense of conspiracy to defraud the United States, "[i]t has long been established that this statutory language is ***not confined to fraud*** as that term has been defined in the common law." *Dennis v. United States*, 384 U.S. 855, 861 (1966) (emphasis added). Rather, "[i]t reaches any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Id*. (quotation marks omitted). *See also United States v. Tuohey*, 867 F.2d 534, 536 (9th Cir. 1989) ("[C]onspiracy to defraud the United States is not limited to common-law fraud, but reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government. . . . [T]he key word 'defraud' now has a fundamentally different meaning in a conspiracy case than it does in a mail fraud prosecution.") (quotation marks omitted). Since conspiracy to defraud the United States is not limited to common-law fraud, but reaches farther, it is much more than common-law fraud, and so "encompasses more than common-law fraud." *Neder*, 527 U.S. at 24. As such, the "presum[ption] that Congress intended to incorporate materiality" is

defeated, and Tang cannot use it to read a "materiality" element into a Section 371 conspiracy to defraud the United States.

Tang also asserts that there must be a "materiality" element in a Section 371 conspiracy to defraud the United States because "[a] materiality requirement is also inherent in the statutory term 'obstruct.'" AOB 15 n.13. But while that statement about the "the statutory term 'obstruct'" may be true, it must be kept in mind that the word "obstruct" is not before us here as a "statutory term." Rather, it is a judicial gloss (by way of cases like *Dennis* and *Tuohey*) on the meaning of the statutory term "defraud." And while it is clear that the law allows courts to infer a "materiality" element in a crime directly from the statutory terms used to define that crime (as in *Neder*), it is not clear that the law allows courts to infer a "materiality" element in a crime from the words that previous courts have used to explain the meaning and scope of the statutory terms used to define that crime.

At any rate, Tang cites no case to suggest that courts can do the latter sort of thing,[4] let alone that they must ***obviously*** do it sua sponte. It

[4] The government suspects there is no such case, because it would run too much against the grain of the law on who is empowered to define the elements of crimes. *See*, *e.g.*, *Dixon v. United States*, 548 U.S. 1, 7 (2006) ("[T]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.") (quotation marks omitted); *McMillan v. Pennsylvania*, 477 U.S. 79, 85 (1986) (similar).

therefore cannot have been plain error for the district court to have failed to instruct the jury that there is a "materiality" element in a Section 371 conspiracy to defraud the United States simply in virtue of the non-statutory word "obstruct." *See Gonzalez-Aparicio*, 663 F.3d at 428; *Campos*, 217 F.3d at 713.

**(ii) Tang's proposed "materiality" instruction did not set forth appropriate principles of the law for the jury to apply to the facts of this case**

Tang's proposed "materiality" instruction did not set forth appropriate principles of the law for the jury to apply to the facts of this case. That proposed instruction was derived from denaturalization cases, which give "materiality" a special definition in the denaturalization context, and that special definition does not apply in the criminal false statement context for at least three interrelated reasons.

***First***, the leading case on "materiality" in the denaturalization context—*Kungys v. United States*, 485 U.S. 759 (1988)—makes it clear that the special definition that "materiality" has in the denaturalization context is, in fact, confined to the denaturalization context. In *Kungys*, a plurality held that a statement is "material" in these now-familiar terms: "a concealment or misrepresentation is material if it has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it

was addressed." *Kungys*, 485 U.S. at 770. Justice Brennan concurred in an opinion that this Court has deemed controlling. *See United States v. Puerta*, 982 F.2d 1297, 1303-04 (9th Cir. 1992). Under the Brennan opinion, a statement is not "material" unless accompanied with "evidence sufficient to raise a fair inference that a statutory disqualifying fact actually existed." *Kungys*, 485 U.S. at 783 (Brennan, J., concurring).[5] But Justice Brennan explicitly based this statutory-disqualifying-fact requirement on the principle that "citizenship is a most precious right, and as such should never be forfeited on the basis of mere speculation or suspicion." *Id*. at 783-84 (Brennan, J., concurring) (citations omitted).

Thus, the statutory-disqualifying-fact requirement can only be in play in the circumstances within its rationale—that is, it can only be in play when that "most precious right" is in danger of being "forfeited" based on a

[5] The *Kungys* plurality quite consciously articulated a formulation of "materiality" meant to supersede that articulated in *Chaunt v. United States*, 364 U.S. 350, 355 (1960), on which case Tang also relies for her "materiality" instruction. *See Kungys*, 485 U.S. at 769 ("With the wisdom of experience, we now conclude that the attempts to construct a [materiality] standard from the *Chaunt* dicta have been both unnecessary and unfortunate."); 772 ("Though this formulation [of 'materiality' announced here] may seem less verbally precise than *Chaunt*, in application it may well produce greater uniformity, since judges are accustomed to using it, and can consult a large body of case precedent."). The government thus disagrees with Tang's contention that cases articulating the *Chaunt* formulation of "materiality" (such as *United States v. Rossi*, 299 F.2d 650, 652 (9th Cir. 1962)) remain good law for that formulation. *Cf*. AOB 17 n.14.

finding of wrongdoing. And such circumstances can obtain only in the denaturalization context, as only naturalized citizens have "citizenship" that they can "forfeit[]" through wrongdoing.

***Second***, this Court has recognized—and in a manner consistent with the foregoing points—that the special definition that "materiality" has in the denaturalization context is indeed confined to the denaturalization context. In *United States v. Alferahin*, 433 F.3d 1148 (9th Cir. 2006), this Court made a number of statements that underscore the special character of "materiality" element in the denaturalization context:

> We emphasized in *Puerta* the uniqueness of a denaturalization proceeding. Indeed, we stressed that we were "look[ing] to the standards governing materiality ***in the denaturalization context*** as a guide to determining what is 'contrary to law' under 18 U.S.C. § 1425." As a result, in *Puerta* we relied on *Kungys v. United States* as the "leading denaturalization case."
>
> * * *
>
> [T]he *Kungys* decision established a ***more rigorous definition of materiality that is unique to the context of denaturalization proceedings***.
>
> * * *
>
> Building on *Kungys*, we held in *Puerta* that the prohibition under 18 U.S.C. § 1425(a) on the procurement of citizenship "contrary to law" incorporated not only a requirement of materiality, but the ***unique definition of materiality articulated in Justice Brennan's controlling opinion*** in *Kungys*.
>
> * * *
>
> We concluded in *Puerta*—***with complete awareness of potentially incongruous constructions in the criminal law***—that relevant Supreme Court precedent in the

> context of denaturalization required us to read § 1425(a) as containing a ***heightened materiality requirement***. Under *Puerta*, then, the crime charged against Alferahin includes not only a requirement of materiality, but the ***more substantial*** requirement that the government produce evidence sufficient to raise a fair inference that Alferahin was statutorily ineligible for permanent residence.

*Alferahin*, 433 F.3d at 1155 (citations omitted; emphasis added except for that in the first passage quoted). By repeatedly emphasizing points of the nature that the *Kungys*/Brennan definition of "materiality" was "unique to the context of denaturalization proceedings," and "more rigorous" than that used in other contexts, and "heightened" relative to the "potentially incongruous constructions in the criminal law" generally, this Court made it clear that the special definition that "materiality" has in the denaturalization context is, indeed, confined to the denaturalization context. *See also United States v. Yoo Taik Kim*, 518 F. App'x 537, 538 (9th Cir. 2013) (affirming conviction on a Section 1546(a) charge based on the "materiality" formulation articulated in Instruction 8.134, and then affirming conviction on a Section 1425 charge based on "the heightened materiality standard required" by that criminal denaturalization statute).

***Third***, there does not appear to be any case in which the special denaturalization formulation of "materiality" has been held to apply in the

criminal false statement context.[6] Instead, in that context, courts define "materiality" just as it was defined for the jury in this case. *See, e.g.*, *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (Section 1001 case) (to be material, "[a] statement must have a natural tendency to influence, or be capable of influencing, the decision of the decision-making body to which it was addressed") (emendations and quotation marks omitted); *United States v. Peterson*, 538 F.3d 1064, 1071 (9th Cir. 2008) (Section 1001 case) ("We hold that . . . it would be preferable for district courts to use the definition of materiality approved by the Supreme Court in *Gaudin*[.]"); *United States v. Chen*, 324 F.3d 1100, 1104-05 (9th Cir. 2003) (immigration-related Section 1001 and Section 1621 case) ("[Chen's 'materiality'] argument invokes the very 'but for' analysis that the Supreme Court rejected in *Kungys*. It has never been the test of materiality that the misrepresentation or concealment would ***more likely than not*** have produced an erroneous decision, or even that it would ***more likely than not*** have triggered an investigation. Rather,

[6] Tang cites *United States v. Hadeed* as a possible counterexample, but the language she relies on in this unpublished April 2010 Fourth Circuit case is inconsistent with *United States v. Garcia-Ochoa*, a published June 2010 Fourth Circuit case. *Compare Hadeed*, 376 F. App'x 335, 341 (4th Cir. 2010) (suggesting that the *Kungys*/Brennan materiality standard applies in a Section 1001 case that deals with immigration) *with Garcia-Ochoa*, 607 F.3d 371, 375-76 (4th Cir. 2010) (stating that the *Gaudin* materiality standard applies in Section 1001 and Section 1546 cases, regardless of context). The government thus submits that *Hadeed* cannot be considered a decision that accurately states the law of the Fourth Circuit.

the test remains whether the statement had a natural tendency to affect an official decision.") (emphasis in original; citations and quotation marks omitted); *United States v. Matsumaru*, 244 F.3d 1092, 1101 (9th Cir. 2001) (Section 1546 case) (defining "materiality" as in *Gaudin*: "A statement is material if it is capable of affecting or influencing a governmental decision."). *See also United States v. Garcia-Ochoa*, 607 F.3d 371, 375-76 (4th Cir. 2010) (Section 1001 and Section 1546 case) (defining "materiality" as in *Gaudin*); *United States v. Wu*, 419 F.3d 142, 144 (2d Cir. 2005) (Section 1546 case) (defining "materiality" as in *Gaudin*); *United States v. Kone*, 307 F.3d 430, 435 (6th Cir. 2002) (Section 1546 case) (defining "materiality" as in *Gaudin*); *United States v. Al-Kurna*, 808 F.2d 1072, 1075 (5th Cir. 1987) (Section 1546 case) (defining "materiality" as in *Gaudin*).

All this case-law is contrary to Tang's proposed jury instructions, and demonstrates that they did not set forth "appropriate principles of the law for the jury to apply to the facts." *Keyser*, 704 F.3d at 642.

**(iii) Even if points (i) and (ii) fail, any instructional error was harmless**

Even if all the foregoing points about the jury instructions are incorrect, the error that Tang assigns to the jury instructions was harmless.

"A district court's failure properly to instruct the jury on an element of the offense is harmless if [this Court] can conclude that it is clear beyond a

reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Munoz*, 412 F.3d 1043, 1047 (9th Cir. 2005) (quotation marks omitted). *See also Neder*, 527 U.S. at 11-13 (reviewing instructional error under harmless-error standard, even though it "prevent[ed] the jury from making a finding on the element").

If we assume that Tang is correct, then the district court should have instructed the jury that it had to make a finding of "materiality" in connection with each of the three offenses charged, and that it could only make such a finding if there were "evidence sufficient to raise a fair inference that a statutory disqualifying fact actually existed." *Kungys*, 485 U.S. at 783 (Brennan, J., concurring).[7]

As the Court knows, among the various "statutory disqualifying fact[s]" that will defeat an I-485 application for adjustment of status is a finding of fraud or misrepresentation in an attempt to procure immigration benefits. *Compare* 8 U.S.C. § 1255(a)(2) (status of alien who inspected and admitted or paroled into the United States may be adjusted, in discretion of the executive branch and under its regulations, to that of an alien lawfully admitted for permanent residence if, among other things, the alien "is admissible to the United States") *with* 8 U.S.C. § 1182(a)(6)(C)(i) ("Any

[7] Please see, again, the footnote on page 36, above.

alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.").

As explained at length above, in Parts III-B and V-A, the jury was presented a great deal of evidence tending to show that, by lies and deception that concerned her living arrangements, the amount of time she spent with Dowai, her intimacy with Dowai, and so on, Tang attempted to procure a visa. The question is simply whether this evidence was "sufficient to raise a fair inference" that Tang was inadmissible under Section 1182(a)(6)(C)(i). *Alferahin*, 433 F.3d at 1155. And no rational jury could have found that the evidence failed to meet that forgiving standard.

It is therefore clear beyond a reasonable doubt that a rational jury would have found Tang guilty absent any error along the lines Tang has assigned; thus, any such was harmless. *Munoz*, 412 F.3d at 1047.

### C. The District Court Correctly Denied Tang's Motion to Dismiss the Indictment, to the Extent Based on the Constitutionality of the Charges

Next, Tang challenges the district court's denial of her motion to dismiss the indictment, to the extent the motion was based on the constitutionality of the charges.[8] AOB 23-30.

Tang's constitutionality-of-the-charges attack on the indictment has two parts. First, Tang contends that the charges in the indictment are unconstitutionally vague. AOB 23-25. Second, Tang contends that the charges unconstitutionally violate due process under *United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675 (2013). AOB 26-30.

Both contentions fail. First, in her void-for-vagueness argument, Tang does not attack the actual charging statutes, and makes no attempt to reconcile her lack-of-notice theory with her admittedly deliberate deceitful conduct. Moreover, this Court has held that Section 371 has no void-for-vagueness problem, and has held that statutes analogous to Sections 1001 and 1546 have no such problem. Second, *Windsor* has no bearing on the charges at issue. Even if we accept *arguendo* Tang's dubious premise that

---

[8] The "to-the-extent-based-on" language is meant to acknowledge that Tang's motion to dismiss had ***two*** bases: the constitutionality of the charges, and the constitutionality of the statute that sets up the District Court for the Northern Mariana Islands and defines the terms of service for its judges. *See* 48 U.S.C. § 1821. The challenge to the constitutionality of that statute is considered in the next part of this brief.

two particular cases must remain good law in order for the charges in this case to be constitutional, Tang's *Windsor*-based argument fails because *Windsor* had no effect on those cases.

**1. Standard of Review**

The standard of review is de novo. *See United States v. Harris*, 185 F.3d 999, 1003 (9th Cir. 1999). "The presumption is that a statute is constitutional." *Id.* "Statutes are construed to avoid defects which would render them unconstitutional." *Id.* at 1003-04.

**2. Applicable Law**

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Gonzales v. Carhart*, 550 U.S. 124, 148-49 (2007).

**3. Argument**

**(i) The charges are not unconstitutionally vague**

First, Tang contends that the charges in the indictment are unconstitutionally vague. This contention lacks merit.

Tang cites no case to suggest that the language of Section 371, of Section 1001, or of Section 1546 founders on the void-for-vagueness doctrine. Indeed, she herself does not even suggest this. Instead, Tang

focuses on supposed interpretive problems in "8 U.S.C. §§ 1154 and 1151, as construed by this Court in *Bark v. INS*, 511 F.2d 1200 (9th Cir. 1975), in light of *Lutwak v. United States*, 344 U.S. 604 (1953)." AOB 23. At any rate, Tang's void-for-vagueness contention fails for at least three reasons.

***First***, she was charged with violating 18 U.S.C. §§ 371, 1001, and 1546, not with violating 8 U.S.C. §§ 1154 and 1151, and she cites no case to suggest that she can invoke the void-for-vagueness doctrine to dig under the language of the charging "penal statute" and attack the language of a benefit statute administered by the agency whose operations the penal statutes at issue are meant to protect. *Cf. Dennis*, 384 U.S. at 866 ("It is no defense to a charge based upon [fraud] that the statutory scheme sought to be evaded is somehow defective.").

***Second***, "[o]bjections to vagueness . . . rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). The evidence laid out above, in Parts III-B and V-A, shows that Tang was actively engaged in a ruse intended to deceive federal officials, that she was aware that she was so engaged, and, above all, that she did not want to get caught in the ruse. A reasonable person of whom these statements can be made would know that her conduct put her at risk of

criminal sanction. And when we consider that Tang's argument is that the administrative immigration law on "spouses" is too vague to have given her notice of when her ***admittedly deliberate*** lies and misrepresentations about her relationship with Dowai could be taken to have crossed the line into "material" territory, the notice problem becomes impossible to discern. *See* Model Penal Code § 241.1(2) ("It is no defense that the declarant mistakenly believed the falsification to be immaterial.").[9]

***Third***, this Court has held that the "penal statute[s]" at issue in this case, or ones meaningfully similar to them, pass muster under the void-for-vagueness doctrine. Thus, in *United States v. Little*, this Court held that Section 371 was not unconstitutionally vague so far as it created the offense of "conspiracy to defraud the United States," particularly since "[t]he *mens rea* requirement of § 371 eliminates any objection that the statute punishes the accused for an offense of which he or she was unaware." 753 F.2d 1420, 1442-43 (9th Cir. 1984). *See also United States v. Heck*, 499 F.2d 778, 788 (9th Cir. 1974) ("[Section] 371 (the conspiracy statute) has repeatedly been held constitutional. . . . [T]he claim that such statute was unconstitutional

---

[9] This Court often looks to the Model Penal Code for guidance in interpreting the criminal law. *See, e.g.*, *United States v. Garcia-Santana*, 774 F.3d 528, 534-35 (9th Cir. 2014) (relying on the Model Penal Code); *United States v. Gomez*, 757 F.3d 885, 906 (9th Cir. 2014) (same); *United States v. Albino-Loe*, 747 F.3d 1206, 1213 (9th Cir. 2014) (same).

[has been] held clearly without merit, and unworthy of comment. . . . This is a valid statute.") (citations and quotation marks omitted).

While the government has not found a case out of this Court examining Section 1001 or Section 1546 under the void-for-vagueness doctrine, it has found cases out of this Court that examine, and sustain, similar statutes under that doctrine. Thus, in *United States v. Harris*, this Court considered a criminal false statement statute, 18 U.S.C. § 1027, under the void-for-vagueness doctrine. 185 F.3d at 1003-04. At the time of the case, Section 1027 created criminal penalties for any person who, in any ERISA-required document,

> . . . makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is ***necessary to verify, explain, clarify or check for accuracy and completeness*** any report required by such title to be published or any information required by such title to be certified[.]

*Id*. at 1003 n.5 (quoting 18 U.S.C. § 1027) (emphasis added). The Court held that this language had no trouble under the void-for-vagueness doctrine:

> As applied, the statute required Harris not to lie on the forms, and to disclose what the instructions told him to disclose. That gave him fair notice. As for whether the forms did or did not require the disclosures the government claims Harris should have made, we take that up in the section below on the sufficiency of evidence. There is nothing vague about this statute, so construed. All a person has to do in order to comply is

> fill out truthfully the two forms . . . according to the instructions.

*Id*. at 1004 (footnotes omitted).

Likewise, in *United States v. Moore*, this Court (sitting en banc) considered another criminal false statement statute, 18 U.S.C. § 922(a)(6), under the void-for-vagueness doctrine. 109 F.3d 1456, 1466-67 (9th Cir. 1997) (en banc). At the time of the case, Section 922(a)(6) created criminal penalties for . . .

> . . . any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact ***material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter***.

*Id*. at 1460 (quoting 18 U.S.C. § 922(a)(6)) (emphasis added). And again, as in *Harris*, the Court held that this language had no trouble under the void-for-vagueness doctrine:

> The record shows that both Mrs. Moore and Wiley understood their respective legal obligations in this case, even though they unlawfully sought to work around them. Mrs. Moore knew full well that a purchaser's name went on "papers" and that fulfilling that role entailed grave responsibilities she did not want. Wiley, too, was aware of the unlawful nature of his conduct. He

> clearly appreciated the legal problems associated with arming a juvenile and used a ruse about his relationship with Bobby to circumvent them.

*Id*. at 1467. The government submits that *Harris* and *Moore* deal with statutes that are similar enough to Section 1001 and Section 1546, as applied in this case, to establish that those latter statutes survive any void-for-vagueness challenge that Tang could be taken to have advanced in this case.

**(ii) The offenses charged were not eliminated by *Windsor***

Second, Tang contends that the charges unconstitutionally violate due process under *United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675 (2013). This contention also lacks merit.

Tang's argument is that *Windsor* implicitly overruled *Lutwak v. United States*, 344 U.S. 604 (1953), and *Bark v. INS*, 511 F.2d 1200 (9th Cir. 1975), which two cases must (Tang continues) remain good law in order for the charges in this case to be constitutional. Assuming *arguendo* that *Lutwak* and *Bark* must still be good law in order for the charges in this case to be constitutional (which the government does not concede), the government submits that Tang's argument fails for at least four reasons.

***First*** and foremost, implicit overruling will not suffice; it is only explicit overruling that can matter here. Inferior courts "are bound to follow a controlling Supreme Court precedent until it is explicitly overruled by that

Court." *United States v. Weiland*, 420 F.3d 1062, 1079 n.16 (9th Cir. 2005). *Windsor* certainly did not "explicitly" overrule *Lutwak*—after all, the text of the *Windsor* opinion doesn't even contain the name "Lutwak." *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."); *San Remo Hotel, LP v. San Francisco City and County*, 364 F.3d 1088, 1095 n.2 (9th Cir. 2004) ("*College of Surgeons*, however, does not even cite *Williamson County*, much less overrule it."). *See also United States v. Osife*, 398 F.3d 1143, 1148 (9th Cir. 2005) ("As the Supreme Court has explained, when there is clearly controlling precedent, circuit courts are not to anticipate the direction in which the Court's jurisprudence is moving[.]"); *United States v. Pacheco-Zepeda*, 234 F.3d 411, 414 (9th Cir. 2000) ("[S]peculation does not permit us to ignore controlling Supreme Court authority.").

***Second***, in *Windsor* the Supreme Court itself made clear that it saw the statutes allowing for immigration-related inquiry into the purposes of a marriage as permissible, and therefore different in kind from the statute it was considering. *See Windsor*, 133 S. Ct. at 2690.

***Third***, no court appears to have taken Tang's position. Instead, courts persist in relying on *Lutwak* in marriage-fraud-related cases. *See, e.g.*, *Koth*

*v. USCIS*, Case 2:12-cv-00996, 2014 WL 583485, at *2 (W.D. Wash. Feb. 14, 2014); *Zemeka v. Holder*, 989 F. Supp. 2d 122, 128-32 (D.D.C. 2013).

***Fourth***, as a conceptual matter *Windsor* could not have overruled *Lutwak*, because the two cases concerned wholly different issues. "For a marriage to confer immigration benefits, it must satisfy three criteria," to include having (1) legal validity and (2) a grounding in "a *bona fide* desire to establish a life together." *Agyeman v. INS*, 296 F.3d 871, 879 n.2 (9th Cir. 2002). At the risk of oversimplifying things: in the immigration context, *Lutwak* concerns the second factor, while *Windsor* concerns the first. *Windsor* does not mean that all legally valid marriages are to be deemed *bona fide*; rather, it means that certain marriages previously deemed *per se* invalid for immigration purposes—namely, same-sex marriages—can now be legally valid in the view of federal law, and so, for the first time, can be open to the more searching and substantive inquiry into whether they are also grounded in a *bona fide* desire to live a life together.

### D. The District Court Correctly Denied Tang's Motion to Dismiss the Indictment, to the Extent Based on the Constitutionality of 48 U.S.C. § 1821

Lastly, Tang challenges the denial of her motion to dismiss the indictment, to the extent based on the constitutionality of 48 U.S.C. § 1821,

which is the statute that sets up the District Court for the Northern Mariana Islands and defines the terms of service for its judges. AOB 30-36.

Tang's constitutionality-of-Section-1821 attack on the indictment centers on Article III of the Constitution. Article III provides, among other things, that "[t]he judicial Power of the United States" shall be exercised by judges who "shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1. Section 1821 provides, among other things, that any judge of the District Court for the Northern Mariana Islands "shall hold office for a term of ten years and until [their] successor is chosen and qualified, unless sooner removed by the President for cause," and "shall receive a salary payable by the United States which shall be at the rate prescribed for judges of the United States district courts." 48 U.S.C. § 1821(b)(1). As Tang observes, this language in Section 1821 makes a judge appointed thereunder more vulnerable to political retaliation (*i.e.*, termination, or diminution in salary) than a judge clothed in the protections of Article III would be. It follows, Tang adds (also rightly), that a judge of the District Court for the Northern Mariana Islands cannot exercise "[t]he judicial Power of the United States" unless that court is somehow excepted from the strictures of Article III. And

while she recognizes that certain courts are so excepted—such that their judges ***can*** exercise "[t]he judicial Power of the United States" ***without*** the full protections of Article III—she contends that the District Court for the Northern Mariana Islands cannot be one of those courts.

This contention lacks merit. As Tang recognizes, there do exist courts excepted from Article III. To establish that the District Court for the Northern Mariana Islands cannot be among them, she bears the "considerable" burden of making a "plain showing" that, in enacting Section 1821, Congress has exceeded its constitutional bounds," and has done something that "lack[s] any reasonable support." And she cannot have discharged this burden, because: (i) she fails to explain why this Court was wrong to reject, in a previous case, the very same argument she now makes; and (ii) she fails to explain why Section 1821 cannot survive the balancing test for federal legislation specifically targeting the CNMI, and thus be deemed a lawful exercise of Congress's power under the document that governs the relations between the United States and the CNMI.

**1. Standard of Review**

Again, the constitutionality of a statute is a question of law reviewed de novo. *See Harris*, 185 F.3d at 1003.

### 2. Applicable Law

The Addendum sets forth the relevant text of the applicable constitutional, statutory, and other provisions.

There is a "time-honored presumption" that federal enactments are constitutional. *Reno v. Condon*, 528 U.S. 141, 148 (2000). "Due respect for the decisions of a coordinate branch of Government demands that [a court] invalidate a congressional enactment only upon a ***plain showing*** that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000) (emphasis added).

The burden is on the party challenging the enactment to demonstrate its alleged unconstitutionality. *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 17, (1988). The burden is "a considerable one," which the challenging party can carry by "show[ing] that the asserted grounds for the legislative [enactment] lack any reasonable support." *Id*.

### 3. Argument

#### (i) Tang fails to explain why the Court was wrong to reject her precise argument previously

As Tang admits, this Court has already rejected the very same argument she now makes. AOB 36 n.29 (citing *United States v. Wei Qin Sun*, 399 F. App'x 319, 320 (9th Cir. 2010)).

*Wei Qin Sun* is, of course, an unpublished case, so Tang is quite right to flag it as a non-precedential decision that leaves her free to make her argument to this Court once again. Still, it must be noted that she has not explained why the Court was wrong to reject her argument in *Wei Qin Sun*. Instead, she has simply presented it much as it was presented before. *Compare* AOB 30-36 *with* Motion for Leave to File Corrected Brief of Appellant, *United States v. Wei Qin Sun*, 399 F. App'x 319 (9th Cir. 2010) (No. 08-10114) (Feb. 3, 2010), 2010 WL 2624996, at *8-23.

The government does not contend it was improper of Tang to have done this. It wasn't. But an arguable consequence is that her argument is open to the same answer that the government gave it before. *See* Answering Brief of the United States at 16-22, *United States v. Wei Qin Sun*, 399 F. App'x 319 (9th Cir. 2010) (No. 08-10114) (Mar. 8, 2010), 2010 WL 2624996, at *14-22. To the extent possible, then, the government would rely on that answer, would here incorporate the just-cited pages into this brief, and would argue that the decision this Court reached in *Wei Qin Sun* was correct and should be reached again here. *Cf. United States v. U.S. Dist. Court for the NMI*, 694 F.3d 1051, 1058 n.10 (9th Cir. 2012), *as amended* (Oct. 16, 2012) (tracking the reasoning in *Wei Qin Sun*).

**(ii) Tang fails to explain why Section 1821 could not be deemed a lawful exercise of Congress's power of Section 105 of the Covenant**

To the extent that the Court does not simply want to adopt the reasoning of *Wei Qin Sun*, the Court nonetheless can and should reject Tang's Section 1821 argument under its case-law interpreting the document that governs the relations between the United States and the CNMI.

As the Court knows, relations between the United States and the CNMI are governed by the "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America" ("the Covenant"). *See generally* Pub. L. 94-241 (Mar. 24, 1976) (quoting the entire text of the Covenant); 48 U.S.C. § 1801 (approving the Covenant); *United States v. Chang Da Liu*, 538 F.3d 1078, 1082-84 (9th Cir. 2008) (briefly discussing the history of United States-CNMI relations).

Under the Covenant, "[t]he United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands." Covenant § 105.

This Court has held that this language—which contemplates Congressional enactment of legislation that is "effective in the [CNMI]," but "cannot also be made applicable to the several States"—makes it "plain" that "Congress has the power to pass legislation with respect to the CNMI that it would not pass with respect to the states[.]" *United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 754 (9th Cir. 1993).

This power, of course, has limits. For a statute that could not "be made applicable to the several States" to be applicable to the CNMI as a valid exercise of Section 105 power, the statute must (1) specifically identify the CNMI, and (2) survive a balancing test whereby "the federal interest to be served by the legislation at issue" must be found to outweigh "the degree of intrusion into the internal affairs of the CNMI." *Id*. at 755.

Section 1821 easily meets these two requirements. Specific identification of the CNMI is obvious. *See generally* 48 U.S.C. § 1821. And the government submits that the federal interest served by setting up a court with "the jurisdiction of a district court of the United States," in order to hear "all causes arising under the Constitution, treaties or laws of the United States," is also obvious. Covenant § 402(c); 48 U.S.C. § 1822.

The "degree of intrusion into the internal affairs of the CNMI," however, seems non-existent. Certainly Tang is silent on reasons to believe

that Section 1821 amounts to any such intrusion. Even aside from that silence, the way that Section 1821 establishes the District Court for the Northern Mariana Islands seems entirely consistent with the interests of the CNMI—as those interests were articulated by the Marianas Political Status Commission ("MPSC"), whose *Section-by-Section Analysis of the Covenant* is known to this Court. *See, e.g.*, *Northern Mariana Islands v. United States*, 399 F.3d 1057, 1065 (9th Cir. 2005) ("We have relied in previous opinions on the Marianas Political Status Commission's authoritative 'Section-by-Section Analysis of the Covenant' to assist us in discerning the meaning of the Covenant.") (some quotation marks omitted). For example, the MPSC indicated that the main interests the CNMI had in the design of the District Court for the Northern Mariana Islands were that the court have no amount-in-controversy requirement; that the court be able to handle purely local matters, without the requirements of indictment by grand jury and trial by jury; and that the court be able to exercise appellate review—to the extent desired by the CNMI legislature—over the decisions of the CNMI local courts. *See* MPSC Section-by-Section Analysis at 32-36. And all of these interests were realized. *See* 48 U.S.C. § 1822.

But as for the judge's terms of service, there is no evidence that the MPSC expected that judges of the District Court for the Northern Mariana

Islands would have the full protections of Article III. On the contrary, it was understood that "[t]he United States w[ould] determine the pay and tenure of the federal judge in the District Court for the Northern Mariana Islands." MPSC Section-by-Section Analysis at 33. The government submits that if, as a matter of "the internal affairs of the CNMI," it had been expected that judges of the District Court for the Northern Mariana Islands have the full protections of Article III, the MPSC surely would not have said this.[10]

As such, there is simply no basis on which to conclude that "the internal affairs of the CNMI" are injured, infringed, or otherwise impaired, to any extent, by the fact that Section 1821 creates a district court staffed by judges that can exercise "[t]he judicial Power of the United States" without the full protections of Article III. Section 1821 thus survives the balancing test laid down in *De Leon Guerrero*, and must be deemed a lawful exercise

[10] It is also bears noting that both parties to the Covenant apparently agreed that Congress's power to pass laws under Section 105 flows from its power under the Territorial Clause. *Compare* MPSC Section-by-Section Analysis at 15 ("[Section 105] assures that Congress will exercise its special authority under Article IV, Section 3, Clause 2 purposefully, after taking into account the particular circumstances existing in the Northern Marianas.") *with* Department of the Interior, *Section-by-Section Analysis of the Covenant*, *reprinted in* S. Rep. No. 94-433 (1975), *available at* 1975 WL 183804, at *3 ("It is understood that the authority of the United States under [Section 105] will be exercised through, among other provisions of the United States Constitution, Article IV, Section 3, Clause 2.").

of Congress's Section 105 power—even though it most likely is not a statute that could "be made applicable to the several States."

Ultimately, though, it is not the government's burden to establish that Section 1821 is a lawful exercise of Congress's Section 105 power. Instead, it isTang's burden to discharge the "considerable" burden of making a "plain showing" that, in enacting Section 1821, Congress has exceeded its constitutional bounds," and has done something that "lack[s] any reasonable support." *Morrison*, 529 U.S. 607; *N.Y. State Club*, 487 U.S. at 17. And given the Section 105 analysis in the preceding paragraphs, the government submits that Tang cannot have discharged that burden.

## VI. CONCLUSION

For all the reasons given above, this Court should affirm each of Tang's convictions.

Respectfully submitted on June 5, 2015 (PDT).

ALICIA A.G. LIMTIACO
United States Attorney

By: *_/s/ Ross K. Naughton_*
ROSS K. NAUGHTON
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on June 5, 2015 (PDT), I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Ross K. Naughton*
ROSS K. NAUGHTON
Assistant United States Attorney

## CERTIFICATE AS TO RELATED CASES

Pursuant to Circuit Rule 28-2.6(a), I certify that, as of June 5, 2015 (PDT), I am not aware of any case now pending before the Ninth Circuit that may be deemed "related" to this one.

*/s/ Ross K. Naughton*
ROSS K. NAUGHTON
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that, as of June 5, 2015 (PDT), this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains no more than **13,950** words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

*/s/ Ross K. Naughton*
ROSS K. NAUGHTON
Assistant United States Attorney